No. 99-527

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 169N

IN THE MATTER OF J.B.,

A Youth in Need of Care.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Carbon,

Honorable G. Todd Baugh, Judge Presiding

COUNSEL OF RECORD:

For Appellant:

Kathryn S. Syth, Gillen, LaRance & Syth, P.C., Billings, Montana

For Respondent:

Honorable Mike McGrath, Attorney General; Stephen C. Bullock,

Assistant Attorney General, Helena, Montana

A. W. "Tony" Kendall, County Attorney, Red Lodge, Montana

Damon Gannett, Billings, Montana (Guardian Ad Litem)

Submitted on Briefs: May 10, 2001

Decided: August 23, 2001

Filed:

_____

Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent but shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number, and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2 Rebecca K. (Rebecca) appeals from the Findings of Fact, Conclusions of Law and Order entered by the Thirteenth Judicial District Court, Carbon County, terminating her parental rights to J.B. We affirm.

¶3 We address the following issue on appeal:

¶4 Did the District Court err in terminating Rebecca's parental rights to J.B. based on abandonment?

*BACKGROUND*

¶5 Rebecca is the natural mother of J.B., born on May 1, 1991. The Department of Health and Human Services (DPHHS) first became involved with J.B.'s situation on January 8, 1998, when Social Worker John Clymer received a referral that J.B. had been severely physically abused by his mother's then-boyfriend, Shawn K., and was suffering neglect. Rebecca and Shawn K. were living in Lovell, Wyoming, at that time but J.B.-who was then six years old-was staying in Red Lodge, Montana, with Rebecca's mother, Kathy.

¶6 Following an initial investigation, DPHHS filed a Petition for Temporary Investigative Authority and Protective Services (TIA) on January 20, 1998. Social Worker Clymer's Report to the Court, attached to the TIA petition, alleged that Rebecca was in an abusive relationship with Shawn K. and had left J.B. with Kathy several times in the preceding months. Clymer alleged that J.B. arrived at these visits with numerous bruises and signs of

abuse, that J.B. exhibited fearful behavior around adults, and that it sometimes appeared J. B. had not eaten in some time. Clymer further alleged that Rebecca's mother suspected Rebecca and Shawn K. of abusing drugs and alcohol.

¶7 The District Court held a show cause hearing on the TIA petition on February 2, 1998. Rebecca did not attend the hearing, and on February 11, 1998, the court issued an order declaring J.B. a youth in need of care, granting the TIA for ninety days, authorizing DPHHS to place J.B. in protective custody, and appointing a guardian ad litem. DPHHS Social Worker MarCee Farrar developed a treatment plan for Rebecca to cover the period between February 2, 1998, and May 2, 1998. The District Court approved the plan, and Rebecca signed and returned it on March 10, 1998. The treatment plan required, among other things, that Rebecca obtain chemical dependency and psychological/mental health evaluations and follow any treatment recommendations, attend individual counseling sessions and parenting classes, meet with a social worker twice a month, and notify DPHHS of any change in residence. DPHHS developed a similar treatment plan for Shawn K.

¶8 In April 1998, Social Worker Farrar determined that Rebecca's progress on her treatment plan was insufficient. Specifically, Farrar determined that Rebecca had not made any attempts to visit J.B. and had not provided DPHHS with evidence that she had attended counseling or parenting classes. Farrar also determined that Shawn K. had not completed his treatment plan. Consequently, DPHHS filed a Petition for Temporary Legal Custody of J.B. on April 28, 1998. The District Court held a show cause hearing on June 2, 1998, and granted custody of J.B. to DPPHS for six months on June 10, 1998. Rebecca informed the court at the June 2 hearing that she and Shawn K. had recently married.

¶9 Rebecca did not visit J.B. until November 24, 1998. After further efforts by Social Worker Farrar to move Rebecca and Shawn K. toward completing their treatment plans were unsuccessful, DPHHS filed a petition to terminate Rebecca's parental rights to J.B. on December 16, 1998. In support of the petition, Farrar submitted an extensive report to the District Court outlining the efforts of several health professionals to resolve the abuse and neglect issues that led to the investigation of Rebecca and Shawn K.'s parenting of J. B. Farrar reported that Rebecca and Shawn K. had demonstrated a lack of involvement and concern toward J.B.'s situation. In regard to Rebecca and Shawn K.'s progress on their treatment plans, Farrar reported the following:

Rebecca and Shawn failed to complete the following [treatment plan] tasks:

parenting classes, counseling, they did not make two contacts a month with a Wyoming or Montana Social Worker, they did not notify the Department upon changing residences, and they did not attempt any visits with [J.B.]

¶10 The District Court held a hearing on the petition to terminate Rebecca's parental rights on March 5, 1999, but Rebecca and Shawn K. failed to attend. The record indicates that the process server responsible for serving Rebecca with the petition for termination and notice of the termination hearing did not personally serve her, but left the notice at her residence with Shawn K. At the hearing, Rebecca's counsel informed the court that he expected Rebecca and Shawn K. to attend the hearing, and that he did not know the reason for their absence. At the behest of Rebecca's counsel, the District Court allowed the initial presentation of the case in Rebecca's absence. The hearing was then continued on April 23, 1999. Again, Rebecca and Shawn K. failed to attend and again Rebecca's counsel stated that he had informed Rebecca of the hearing and did not know the reason for their absence. Following the hearings, the court issued findings of fact and conclusions of law and an order terminating Rebecca's parental rights to J.B. on May 21, 1999. Rebecca appeals.

## STANDARD OF REVIEW

¶11 "In reviewing a decision to terminate parental rights, this Court determines whether the district court's findings of fact supporting termination are clearly erroneous and whether the district court's conclusions of law are correct." *In re B.F.*, 2000 MT 231, ¶ 7, 301 Mont. 281, ¶ 7, 8 P.3d 790, ¶ 7 (citation omitted). It is well established that a natural parent's right to care and custody of her child is a fundamental liberty interest which must be protected by fundamentally fair procedures. *See, e.g., In re B.F.*, ¶ 7; *In re A.N.*, 2000 MT 35, ¶ 22, 298 Mont. 237, ¶ 22, 995 P.2d 427, ¶ 22.

## DISCUSSION

¶12 **Did the District Court err in terminating Rebecca's parental rights to J.B. based on abandonment?**

¶13 Rebecca's sole argument on appeal is that the District Court erred in terminating her parental rights to J.B. on grounds of abandonment because the statutorily prescribed notice procedures were not properly followed. Section 41-3-609, MCA (1997), authorizes a district court to order termination of the parent-child relationship if the child has been

abandoned as set forth in § 41-3-102, MCA. However, § 41-3-608, MCA (1997), provides as follows:

> **Notice. Before a termination of the parent-child legal relationship based on abandonment may be ordered, the court shall determine whether the rules of civil procedure relating to service of process on the parents have been followed. If the parents were not served personally, the petitioner must file an affidavit stating what efforts have been made to locate the parent or parents of the child. The affidavit must be filed at least 10 days prior to the hearing.**

¶14 Although the District Court in the present case did not make any specific finding or conclusion that J.B. was abandoned according to § 41-3-102, MCA, the court used the following language in ordering termination of Rebecca's parental rights:

> WHEREFORE, IT IS ORDERED, ADJUDGED AND DECREED . . . [t]hat pursuant to the petition filed herein, and based on the abandonment by the natural mother and the failure of the mother to appear, the parental rights of Rebecca . . . , the natural mother, are hereby terminated.

(Emphasis added.) The record is clear that Rebecca was not personally served with notice of the parental termination hearing and that DPHHS did not file an affidavit stating what efforts it had made to locate her, as required by § 41-3-608, MCA (1997). Rebecca argues, therefore, that the District Court's order terminating Rebecca's parental rights to J.B. based on abandonment was erroneous.

¶15 The State concedes that DPHHS did not adhere to the notice requirements of § 41-3-608, MCA (1997). The State argues, however, that we need not consider Rebecca's argument regarding termination based on abandonment because the District Court relied on separate grounds-not challenged by Rebecca-in terminating her parental rights. We agree.

¶16 Section 41-3-609, MCA (1997), sets forth the criteria for termination of parental rights. The statute provides, in pertinent part, as follows:

> (1) The court may order a termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:
>
> . . .

(b) the child has been abandoned by the parents as set forth in 41-3-102;

. . . or

(e) the child is an adjudicated youth in need of care and both of the following exist:

(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time[.]

Section 41-3-609(1), MCA (1997) (emphasis added). The five criteria set forth in § 41-3-609, MCA (1997), are set forth disjunctively. Each of the individual criterion, standing alone, supports termination of a parent-child relationship.

¶17 In regard to § 41-3-609(1)(e), MCA (1997), the District Court made the following findings:

4. That [J.B.] was adjudicated a youth in need of care on February 2, 1998, and that he remains a youth in need of care.

5. That an appropriate treatment plan for Rebecca . . . was approved by this Court on March 16, 1998.

6. That Rebecca . . . has not complied with the terms of that plan in that she has failed to seek or attend individual therapeutic treatment counseling sessions even though such have been made available to her.

. . .

13. That the evidence is clear and the Court is convinced that the conduct of Rebecca . . . is unlikely to change within any reasonable time and that any continuation of the parent and child relationship between her and the above youth would result in even more abuse and neglect of the above youth.

¶18 Rebecca does not dispute the above findings nor does she argue that the District Court

erred in terminating her parental rights based on her failure to complete her treatment plan. We conclude, based on the findings set forth above, that termination of Rebecca's parental rights was proper pursuant to § 41-3-609(1)(e), MCA (1997). Because the District Court's order terminating Rebecca's parental rights to J.B. is supported by adequate statutory grounds independent of abandonment, we conclude it is unnecessary to address Rebecca's argument that the court erred in terminating her parental rights based on abandonment.

¶19 Affirmed.

/S/ JIM RICE

We concur:

/S/ KARLA M. GRAY

/S/ JIM REGNIER

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART